## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIAN KEIPPEL, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>      v.<br><br>ARRAY TECHNOLOGIES, INC. f/k/a ATI INTERMEDIATE HOLDINGS, LLC, JIM FUSARO, NIPUL PATEL, TROY ALSTEAD, ORLANDO D. ASHFORD, FRANK CANNOVA, RON P. CORIO, BRAD FORTH, PETER JONNA, JASON LEE, ATI INVESTMENT PARENT, LLC, OAKTREE ATI INVESTORS, L.P., OAKTREE POWER OPPORTUNITIES FUND IV, L.P., and OAKTREE POWER OPPORTUNITIES FUND IV (PARALLEL), L.P.,<br><br>                Defendants. | Case No.<br><br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Julian Keippel ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by Array Technologies, Inc. ("Array" or the "Company"), Array's filings with the United States ("U.S.") Securities and Exchange Commission ("SEC"), and media and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth hereinafter a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of:

(a)     All persons or entities who purchased or otherwise acquired Array securities between October 14, 2020 and May 11, 2021, inclusive (the "Class Period"), against Array and the Exchange Act Individual Defendants (as defined *infra*) for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; and

(b)     All persons and entities that purchased or otherwise acquired Array common stock pursuant, or traceable, or both, to: (i) the registration statement and prospectus (the "IPO Materials") issued in connection with the Company's October 2020 initial public offering (the "IPO"); or (ii) the registration statement and prospectus (the "December 2020 SPO Materials") issued in connection with the Company's December 2020 offering (the "December 2020 SPO"); or (iii) the registration statement and prospectus (the "March 2021 SPO Materials") issued in connection with the Company's March 2021 offering (the "March 2021 SPO"); or (iv) any combination of the IPO, December 2020 SPO, or March 2021 SPO (collectively, the "Offerings"), against the Securities Act Defendants (as defined *infra*) for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Under Section 11 of the Securities Act, the Securities Act Defendants are strictly liable for any false and misleading statements in the IPO Materials, the December 2020 SPO Materials, and the March 2021 SPO Materials (collectively, the "Array Offering Materials"). Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct as to the Securities Act claims.

3.      Array describes itself as one of the world's largest manufacturers of ground-mounting systems used in solar energy projects.  According to its SEC filings, Array's principal

product is an integrated system of steel supports, electric motors, gearboxes and electronic controllers commonly referred to as a single-axis "tracker."  Trackers move solar panels throughout the day to maintain an optimal orientation to the sun, which significantly increases their energy production.  Solar energy projects that use trackers generate up to 25% more energy and deliver a 22% lower levelized cost of energy ("LCOE") than projects that use "fixed tilt" mounting systems.  Trackers represent between 10% and 15% of the cost of constructing a ground-mounted solar energy project, and approximately 70% of all ground-mounted solar energy projects constructed in the U.S. during 2019 utilized trackers according to BloombergNEF and IHS Markit, respectively, as discussed in Array's SEC filings.

4.     In the Offerings, Defendants made no mention of issues revolving around, *inter alia*, material negative impacts of rising steel and freight costs on its operations.  Furthermore, subsequent to the Offerings during the Class Period, Defendants repeatedly and consistently painted a materially misleading picture of the Company's business and prospects that did not reflect these rising costs.  After the Offerings, and subsequent to the Class Period, Array disclosed that it was experiencing increases in steel prices and substantial increases in the cost of both ocean and truck freight that in turn were having a material impact on its margins for the foreseeable future.  This caused Array to miss profit expectations and withdraw its full-year outlook.

5.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 1013-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.      Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). Array's stock trades on the Nasdaq Global Market ("NASDAQ"), a national stock exchange located in this Judicial District.  Leading up to the Offerings, Array directed investors who sought information regarding the Offerings to contact, *inter alia*, Goldman Sachs & Co., LLC and Guggenheim Securities, LLC at their offices in this Judicial District.  Several defendants, as set forth *infra*, have offices in this Judicial District.  Many of the acts charged herein, including the preparation or dissemination of materially false or misleading information, occurred in substantial part in this Judicial District.

9.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

10.      Plaintiff, as set forth in the attached Certification, purchased Array securities during the Class Period and/or Array common stock pursuant, or traceable, or both, to the Array Offering

Materials issued in connection with the Offerings, and was damaged thereby as the result of Defendants' wrongdoing as alleged in this complaint.

11.     Defendant Array is a Delaware corporation with its principal executive offices located at 3901 Midway Place NE, Albuquerque, New Mexico 87109.  The Company's common stock is listed on the NASDAQ under the ticker symbol "ARRY."  Array was formerly known as ATI Intermediate Holdings, LLC.  Immediately prior to the effectiveness of the IPO registration statement, ATI Intermediate Holdings, LLC converted into Array pursuant to a statutory conversion and changed its name to "Array Technologies, Inc."  Array is the named registrant on the registration statements for the Offerings.

12.     Defendant Jim Fusaro ("Fusaro") was, at all relevant times, and is currently Array's Chief Executive Officer and a Director of the Company.  Defendant Fusaro signed the registration statements in connection with the Offerings which were filed with the SEC.

13.     Defendant Nipul Patel ("Patel") was, at all relevant times, and is currently Array's Chief Financial Officer.  Defendant Patel signed the registration statements in connection with the Offerings which were filed with the SEC.

14.     Defendants Fusaro and Patel are collectively referred to hereinafter as the "Exchange Act Individual Defendants."  The Exchange Act Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Array's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-

public information available to them, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading.  The Exchange Act Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Exchange Act Individual Defendants.

15.     Array and the Exchange Act Individual Defendants are collectively referred to herein as the "Exchange Act Defendants."

16.     Defendant Troy Alstead ("Alstead") was, at all relevant times, and is currently a Director of the Company.  Defendant Alstead signed the registration statements in connection with the Offerings which were filed with the SEC.

17.     Defendant Orlando D. Ashford ("Ashford") was, at all relevant times, and is currently a Director of the Company.  Defendant Ashford signed the registration statements in connection with the Offerings which were filed with the SEC.

18.     Defendant Frank Cannova ("Cannova") was, at all relevant times, and is currently a Director of the Company.  Defendant Cannova signed the registration statements in connection with the Offerings which were filed with the SEC.

19.     Defendant Ron P. Corio ("Corio") was, at all relevant times, and is currently a Director of the Company.  Defendant Corio signed the registration statements in connection with the Offerings which were filed with the SEC.

20.     Defendant Brad Forth ("Forth") was, at all relevant times, and is currently the Chairman of the Board of Directors of the Company.  Defendant Forth signed the registration statements in connection with the Offerings which were filed with the SEC.

21.     Defendant Peter Jonna ("Jonna") was, at all relevant times, a Director of the Company.  Defendant Jonna signed the registration statements in connection with the Offerings which were filed with the SEC.

22.     Defendant Jason Lee ("Lee") was, at all relevant times, and is currently a Director of the Company.  Defendant Lee signed the registration statements in connection with the Offerings which were filed with the SEC.

23.     Defendants Fusaro, Patel, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee are collectively referred to hereinafter as the "Securities Act Individual Defendants."  As directors, executive officers, and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Array common stock in the Offerings for their own benefit and the benefit of the Company.  The Securities Act Individual Defendants were key members of the Offerings' working group and executives of the Company who pitched investors to purchase the shares sold in the Offerings.

24.     Defendant ATI Investment Parent, LLC ("ATI") was the former parent company of ATI Intermediate Holdings, LLC and a selling shareholder in the Offerings.  ATI maintains an office in this Judicial District.

25.     Defendant Oaktree ATI Investors, L.P. ("Oaktree ATI") was, at all relevant times, a co-controlling member of ATI Intermediate Holdings, LLC.  Oaktree ATI maintains an office in this Judicial District.

26.     Defendant Oaktree Power Opportunities Fund IV, L.P. ("Oaktree Power") was, at all relevant times, a co-controlling member of ATI Intermediate Holdings, LLC.  Oaktree Power maintains an office in this Judicial District.

27.     Defendant Oaktree Power Opportunities Fund IV (Parallel), L.P. ("Oaktree Power Parallel") was, at all relevant times, a co-controlling member of ATI Intermediate Holdings, LLC. Oaktree Power Parallel maintains an office in this Judicial District.

28.     For the purposes of the Securities Act claims alleged herein, Defendants Array, the Securities Act Individual Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel may hereafter be referred to at times as the "Securities Act Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued in the IPO Materials

29.     On September 22, 2020, Array (then known as ATI Intermediate Holdings, LLC) filed a Registration Statement on Form S-1 with the SEC which was subsequently amended several times and declared effective by the SEC on October 14, 2020.  On or about October 14, 2020, Array issued a Prospectus pursuant to Rule 424(b)(4).  These documents are collectively the "IPO Materials."  In the IPO, Array sold 7,000,000 shares of Company stock at $22.00 per share for approximate proceeds of $146 million before expenses and after applicable underwriting discounts, and ATI sold 40,500,000 shares of Company stock at $22.00 per share for approximate proceeds of $842 million before expenses and after applicable underwriting discounts.

30.     The IPO Materials stated in relevant part that one of the Company's "Strengths" was related to its management of costs:

- **Demonstrated ability to reduce the cost of our products while increasing profit margins.** In order to enhance the competitiveness of our products and increase our margins, we continually work to reduce the cost of our products through innovation and rigorous supply chain management. These efforts have resulted in a reduction in cost of goods sold per watt by approximately 23% from 2017 through 2019. This has allowed us to reduce average selling prices by approximately 20% over the same period, driving significant increases in revenues, while simultaneously increasing gross profits and gross margins.

* * *

8

- **Rigorous supply chain management supported by a sophisticated enterprise resource planning ("ERP") system.** We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale. In addition, we believe the large volume of purchases that we make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage.

31.     With respect to the Company's "Strategy," the IPO Materials highlighted:

- **Leveraging our global supply chain and economies of scale to reduce product cost.** Purchased components are the largest contributor to our cost of goods sold. Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.

32.     The IPO Materials failed to adequately disclose the then-existing rise of costs related to certain supplies such as steel, as well as the Company's freight costs. These were likely to have, and were having, an adverse effect on the Company's business and operations. The IPO Materials were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation. They were materially false and misleading in that they omitted to state, *inter alia*, the ongoing impact of various rising costs, and as a result of the foregoing, the Company's positive statements about its business and operations lacked a reasonable basis.

33.     Moreover, under applicable SEC rules and regulations, the IPO Materials were required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

**Materially False and Misleading Statements Issued in the December 2020 SPO Materials**

34.     On November 30, 2020, Array filed a Registration Statement on Form S-1 with the SEC which was subsequently amended and declared effective by the SEC on December 2, 2020. On or about December 2, 2020, Array issued a Prospectus pursuant to Rule 424(b)(4).  These documents are collectively referred to as the "December 2020 SPO Materials."  In the December 2020 SPO, ATI sold 31,875,000 shares of Company stock at $35.00 per share for approximate proceeds of $1.1 billion before expenses and after applicable underwriting discounts.

35.     The December 2020 SPO Materials stated in relevant part that one of the Company's "Strengths" was related to its management of costs:

- **Demonstrated ability to reduce the cost of our products while increasing profit margins.** In order to enhance the competitiveness of our products and increase our margins, we continually work to reduce the cost of our products through innovation and rigorous supply chain management. These efforts have resulted in a reduction in cost of goods sold per watt by approximately 23% from 2017 through 2019. This has allowed us to reduce average selling prices by approximately 20% over the same period, driving significant increases in revenues, while simultaneously increasing gross profits and gross margins.

* * *

- **Rigorous supply chain management supported by a sophisticated enterprise resource planning ("ERP") system.** We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale. In addition, we believe the large volume of purchases that we make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage.

36.     With respect to the Company's "Strategy," the December 2020 SPO Materials highlighted:

- **Leveraging our global supply chain and economies of scale to reduce product cost.** Purchased components are the largest contributor to our cost of goods sold. Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.

37.    The December 2020 SPO Materials failed to adequately disclose the then-existing rise of costs related to certain supplies such as steel, as well as the Company's freight costs.  These were likely to have, and were having, an adverse effect on the Company's business and operations. The December 2020 SPO Materials were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.  They were materially false and misleading in that they omitted to state, *inter alia*, the ongoing impact of various rising costs, and as a result of the foregoing, the Company's positive statements about its business and operations lacked a reasonable basis.

38.    Moreover, under applicable SEC rules and regulations, the December 2020 SPO Materials were required to disclose known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

**Materially False and Misleading Statements Issued in the March 2021 SPO Materials**

39.    On March 16, 2021, Array filed a Registration Statement on Form S-1 with the SEC, which was declared effective by the SEC on March 18, 2021.  On or about March 18, 2021, Array issued a Prospectus pursuant to Rule 424(b)(4).  These documents are collectively referred to as the "March 2021 SPO Materials."  In the March 2021 SPO, ATI sold 31,054,971 shares of Company stock at $28.00 per share for approximate proceeds of $846 million before expenses and after applicable underwriting discounts.

40.     The March 2021 SPO Materials stated in relevant part that one of the Company's "Strengths" was related to its management of costs:

- **Demonstrated ability to reduce the cost of our products while maintaining profit margins.** In order to enhance the competitiveness of our products and increase our margins, we continually work to reduce the cost of our products through innovation and rigorous supply chain management. These efforts have resulted in a reduction in cost of goods sold per watt by approximately 22% from 2017 through 2020. This has allowed us to reduce average selling prices by approximately 22% over the same period, driving significant increases in revenues, while simultaneously increasing gross profit and maintaining gross margin.

* * *

- **Rigorous supply chain management supported by a sophisticated enterprise resource planning ("ERP") system.** We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale. In addition, we believe the large volume of purchases that we make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage.

41.     With respect to the Company's "Strategy," the March 2021 SPO Materials highlighted:

- **Leveraging our global supply chain and economies of scale to reduce product cost.** Purchased components are the largest contributor to our cost of goods sold. Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.

42.     The March 2021 SPO Materials failed to adequately disclose the then-existing rise of costs related to certain supplies such as steel, as well as the Company's freight costs.  These were likely to have, and were having, an adverse effect on the Company's business and operations.

12

The March 2021 SPO Materials were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.  They were materially false and misleading in that they omitted to state, *inter alia*, the ongoing impact of various rising costs, and as a result of the foregoing, the Company's positive statements about its business and operations lacked a reasonable basis.

43.     Moreover, under applicable SEC rules and regulations, the December 2020 SPO Materials were required to disclose known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

### Materially False and Misleading Statements Issued During the Class Period

44.     The Class Period for Plaintiff's Exchange Act claims begins on October 14, 2020 and runs through May 11, 2021, inclusive.

45.     On or about October 14, 2020, Array published a press release announcing that its "shares of common stock are expected to begin trading on the [NASDAQ] on October 15, 2020 under the symbol 'ARRY.'"  The October 14, 2020 press release further stated that the afore-mentioned "registration statement relating to this offering was declared effective by the Securities and Exchange Commission on October 14, 2020" and was available from Goldman Sachs & Co. LLC, Guggenheim Securities, LLC, and others.  The press release stated:

> Array Technologies is one of the world's largest manufacturers of ground-mounting systems used in solar energy projects. The Company's principal product is an integrated system of steel supports, electric motors, gearboxes, electronic controllers and software, commonly referred to as a single-axis "tracker." Trackers move solar panels throughout the day to maintain an optimal orientation to the sun, which significantly increases their energy production. Solar energy projects that use trackers generate up to 25% more energy and deliver a lower levelized cost of energy than projects that use conventional "fixed tilt" mounting systems.

46.     On October 19, 2020, Array issued a press release announcing the close of its IPO,

which stated in part:

> Array Technologies is one of the world's largest manufacturers of ground-mounting systems used in solar energy projects. The Company's principal product is an integrated system of steel supports, electric motors, gearboxes, electronic controllers and software, commonly referred to as a single-axis "tracker." Trackers move solar panels throughout the day to maintain an optimal orientation to the sun, which significantly increases their energy production. Solar energy projects that use trackers generate up to 25% more energy and deliver a lower levelized cost of energy than projects that use conventional "fixed tilt" mounting systems.

47.     On November 6, 2020, Array held a conference call with analysts to discuss its

third quarter 2020 results.  During this call, Defendant Patel stated in part:

> Gross margins in the third quarter were lower than the prior year period as a result of having less revenue to absorb fixed costs as well as higher logistics costs, largely driven by the global shipping constraints due to COVID-19.

> Importantly, we view both of these dynamics as short term in nature and not indicative of longer-term margin pressure. Operating expenses were roughly flat compared to prior period, excluding professional fees related to our IPO and change for contingent consideration, reflecting tight controls on expenses.

> * * *

> Gross margins increased 24.2% from 21.3% in the prior year period, driven by reductions in purchase materials resulting from improved supplier arrangements and shifting volumes for certain components to new lower-cost suppliers and greater leverage of fixed costs against higher sales volumes.

> * * *

> We decided to provide guidance for the full-year 2020 to give our new public investors additional insight into our outlook for the remainder of the year. Going forward, we will be providing annual guidance as part of our fourth quarter and full year earnings announcements. We will not be providing quarterly guidance in future periods.

> For the full-year 2020 ending December 31, 2020, we expect revenues to be in the range of $845 million to $865 million, adjusted EBITDA to be in the range of $156 million to $160 million, adjusted net income per share to be in the range of $0.82 to $0.86. This assumes diluted shares outstanding for the three months ending

December 31, 2020, of 126,123,723 shares and diluted shares outstanding for the 12 months ending December 31, 2020, of 121,535,154.

Our guidance excludes the impact of any onetime charges, expenses related to the recapitalization and IPO, income or expense related to contingent consideration as well as any related tax impacts.

48.     On that same call, Defendant Fusaro stated in part:

Solar with single-access trackers has proven to be one of the cleanest and lowest cost forms of generation, and we see demand for trackers growing faster than the overall market for solar as customers convert from fixed tilt. Moreover, customers are increasingly recognizing the superior reliability and durability of our tracking system, and that is leading to market share gains for our products.

These factors, combined with our strong order book, give us confidence that we are very well positioned to have another year of substantial growth in 2021.

49.     On March 9, 2021, Array held a conference call with analysts to discuss fourth

quarter 2020 results.  During this call, Fusaro stated in relevant part:

In the US market, we are continuing to grow our wallet share with existing customers as well as convert new customers to Array as demonstrated by our strong order book. During 2020, we added 38 new customers underscoring our ability to convert new accounts to Array products. Outside of the US, we are in the process of building the sales and supply chain and fulfillment infrastructure we need to service international customers. COVID-19 has slowed some of our plans that we expect to be able to accelerate our international strategy later this year as travel restrictions and other challenges created by the pandemic abate.

50.     During the same call, Defendant Patel stated in part:

First, as Jim discussed earlier, we have made product innovation a priority and we are investing in it. In addition to the research center he discussed, we will be adding additional engineering resources and investing more in R&D. These investments have a near-term cost as we will be making the investments ahead of the incremental revenues that we expect to generate from new products. But the long-term results should be higher revenues, greater market share and increased margins. Second, we are investing in the sales, supply chain and fulfillment infrastructure we need to service our international customers. The more to our investments in new product development, we have a short-term mismatch between the cost of our investment and the revenues that they will yield. Third, our 2021 SG&A reflects additional public company costs, which will represent a year-over-year headwind for us. And finally, commodity prices and freight costs have increased significantly over the past several months as a result of the re-acceleration of the global economy

while certain transportation and raw material capacity remains offline as a result of the pandemic. While we expect prices to normalize and our contracts allow us to pass on these costs to our customers, we have taken a conservative approach to our guidance by making these cost into the low end of our guidance assuming a delayed return to more normalized pricing.

I'd like to close by providing some key modeling assumptions for the full year 2021. As I mentioned earlier, the two-year push out of the ITC step down has impacted how customers time their orders. As a result, we will see a different quarterly distribution of revenues and earnings in 2021 than we did in 2020. We currently expect to generate 20% to 25% of our annual revenues in Q1, 25% to 30% in Q2, 25% to 30% in Q3, and 20% to 25% in Q4. We expect interest expense to be between $26 million to $28 million. Diluted weighted average share count for 2021 to be $127.5 million shares, and our effective tax rate to be 25%.

51.     During the same call, an analyst asked: "It wasn't clear to me as the impacts of these investments and other expenses during the year; how it's distributed across gross versus EBIT margins? So it sounded like it was more below the line, below operating expense related than it was direct costs. Can you just sort of give us some sense there?"  Defendant Patel responded in part: "So on the other -- on the margin side, we built into our range. The impact of higher freight and raw material costs really not abating as quickly and that's really the other half of that cost that we have in our guidance range, Paul."

52.     Later in that call, a different analyst asked "is the cost of steel becoming a problem for you, world steel [*sic*]?"  Defendant Fusaro responded in relevant part:

So, we obviously manage and monitor all commodities accordingly, and then we build in productivity measures to address that to continue to drive our value. If your question was pertaining to our supply chain, -- sorry, Michael, could you clarify your question?

[Analyst]: ... I'm thinking about the pressure on margins from cost inputs.

[Fusaro]: Yes. I mean, there is always going to be pressure on cost. That's pretty much market agnostic and product agnostic. But that said, we've actually built up, we continue to build out our supply chain. We added 15 new suppliers in four new countries. So that's just going to be an area that we remain focused on going forward as we grow both domestic here and internationally.

53.     Again later in that call, an analyst asked: "Okay, great. And then, a little bit back to the question around input costs and supply chain. Are you guys looking at any new materials that could potentially reduce your cost of goods sold?"  Defendant Fusaro replied: "Yes. Now, don't ask what they are."

54.     An analyst also asked: "So just a bit [*sic*], you're talking about the first half of the year fully booked based on the backlog and when would you be buying that steel just as it's been moving quite a bit? So have you locked in the steel as you locked in that pricing, so you have high visibility into the margins or not necessarily so?"  Defendant Patel responded:

> Yes. So we typically -- I'll just give you our typical order patterns. We typically order material between six and 12 weeks from the date of the shipment. So we keep very low inventory. So the impact obviously, if the COGS, the recent run up prices would impact second half more than it would first half.

55.     An analyst also asked:

> So in the guidance, you highlight your expectation that commodity prices and freight charges to normalize over time. Just curious what drives that normalization view and then how long it would take -- how long the cost would need to remain elevated before you seriously decided are considered passing it on to customers, and then how to think about any concerns surrounding implications to demand from customers from higher costs?

Defendant Patel responded in relevant part:

> So as far as that first part of the question, as far as how long we think it is and obviously, it's unknown, it's -- we're on unprecedented times as far as the commodity prices increasing. And it's really just -- it's a lot of the -- as the economy begins to reopen, there is a lot of pre-pandemic capacity that still remains idle. So we are thinking second half and late second half is when it's coming back online. And as far as your second half of the question, we're always evaluating all our pricing on our projects and we know that we have that ability and we'll look at it on a case by case basis, so.

56.     The statements contained in ¶¶ 45-55 were materially false or misleading when made because Defendants omitted and otherwise failed to disclose that dating back to the first quarter of 2020, prices of certain commodities such as steel were increasing dramatically, and that

Array was facing increasing freight costs, and as a result of the foregoing, the Company's positive statements about its business and operations lacked a reasonable basis.

**The Truth Emerges**

57.     On May 11, 2021, after the close of trading, Array shocked the market by reporting, *inter alia*, lower revenues year-over-year and lower margins as a result of increased steel and shipping costs in a press release and a Form 8-K filed with the SEC:

> "Revenues for the first quarter of 2021 were in line with our expectations and Adjusted EBITDA was slightly below our expectations as a result of higher than expected logistics costs. Results were lower compared to last year because of the unseasonably high volume of shipments we had in the first quarter of 2020 to customers that were 'safe harboring' tracker systems in connection with the ITC step-down," said Jim Fusaro, Chief Executive Officer of Array Technologies.

> * * *

> At the same time as we are seeing record demand for solar, our industry is contending with increases in steel and shipping costs that are unprecedented both in their magnitude and rate of change. From Q1 2020 to Q1 2021, spot prices of hot rolled coil steel, the primary raw material used in our products, more than doubled and have continued to increase in the second quarter with spot prices up over 10% since April 1st. Steel represents almost half of our cost of goods sold and we do not hold large amounts of steel inventory, so a significant increase in the price of steel over a short period of time can negatively impact our results.

> "The continuing increases in both steel and freight costs will impact our margins in the second quarter and potentially in subsequent quarters if prices do not normalize. We are taking several actions to mitigate the impact on the balance of the year, including passing through higher commodity and shipping costs to our customers, fixing commodity prices with our suppliers, entering into long-term contracts with freight providers, further diversifying our supply base, and increasing order lead-times to give us more time to procure raw material.["]

> * * *

> **First Quarter 2021 Financial Results**

> Revenues decreased 44% to $245.9 million compared to $437.7 million for the prior-year period, primarily driven by a reduction in the amount of ITC safe harbor related shipments.

Gross profit decreased 63% to $43.9 million compared to $118.4 million in the prior year period, driven primarily by lower volume in the quarter. Gross margin decreased from 27% to 18%, driven by less revenue to absorb fixed costs, higher margins on the 2020 safe harbor shipments, higher input costs due to a rapid increase in commodity prices and greater freight costs resulting in part from disruptions caused by the winter storm in Texas as well as port closures and congestion.

Operating expenses increased to $30.8 million compared to $17.1 million during the same period in the prior year, primarily as a result of a $6.2 million increase in equity-based compensation due to the transition to being a public company, $2.4 million of one-time costs related to our common stock follow-on offerings, and higher costs associated with being a public company and an increase in headcount to support our product development and international growth initiatives.

Net income was $2.9 million compared to income of $73.7 million during the same period in the prior year, and basic and diluted income per share were $0.02 compared to basic and diluted earnings per share of $0.61 during the same period in the prior year.

Adjusted EBITDA decreased 69% to $34.5 million, compared to $110.7 million for the prior-year period.

Adjusted net income decreased 71% to $23.7 million compared to $82.3 million during the same period in the prior year, and adjusted basic and diluted adjusted net income per share was $0.19 compared to $0.69 during the same period in the prior year.

58.     Array also announced that Defendant Jonna had resigned from the Board of Directors effective May 10, 2021.

59.     During a conference call with investors after the close of trading on May 11, 2021, Defendant Fusaro stated:

[O]ur industry is contending with increases in steel and shipping costs that are unprecedented, both in their magnitude and rate of change.

From the first quarter of 2020 to the first quarter of 2021, the spot price of hot rolled coil steel, the primary raw material used in our products, has more than doubled. Many industry analysts and market participants expected the dramatic increase in the price of steel to be temporary, which was reflected in futures markets that had indicated lower steel prices for the second half of the year throughout most of the first quarter. Based on those expectations, we felt confident in our ability to manage our input costs and maintain our margins. However, steel prices have continued to

increase with spot prices of hot rolled coil up more than 10% since April 1st, and futures now indicate higher rather than lower steel prices for the remainder of the year.

Steel represents almost half of our cost of goods sold, and we do not hold large amounts of steel and inventory. So, a significant increase in the price of steel over a short period of time can negatively impact our results.

Coinciding with the increase in steel prices has been substantial increases in the cost of both, ocean and truck freight. The average cost to ship a container from Asia to the West Coast has increased by more than 145% from April 2020 to April 2021. There also remains a significant disruption across several U.S. ports, resulting from the April Suez Canal accident, and the February Texas storm, which has resulted in higher storage and expediting costs that we would not otherwise have had in a normal environment. The cost of truck freight has also increased significantly with the average cost per mile in the first quarter of 2021, up more than 30% versus last year, and costs have continued to increase in the second quarter.

The continued increases in both steel and freight costs will impact our margins in Q2, and potentially in subsequent quarters, if prices do not normalize.

60.     During that same conference call, Defendant Patel disclosed:

Revenues for the first quarter decreased 44% to $245.9 million, compared to $437.7 million for the prior year period, primarily driven by a reduction in the amounts of ITC safe harbor related shipments that I discussed earlier.

Gross profit decreased 63% to $43.9 million compared to $118.4 million in the prior year period, driven primarily by lower volume in the quarter. Gross margin decreased from 27% to 18%, driven by less revenue to absorb fixed costs, somewhat lower ASPs compared to the 2020 safe harbor shipments, higher input costs, due to primarily to higher steel prices and higher freight costs, resulting in part from disruptions caused by the winter storm in Texas, as well as West Coast port closures and congestion.

Operating expenses increased to $30.8 million compared to $17.1 million during the same period in the prior year, primarily as a result of a $6.2 million increase in equity-based compensation due to the transition to being a public company, $2.4 million of onetime costs related to our common stock follow-on offerings, higher costs associated with being a public company, and an increase in headcount to support our product development and international growth initiatives.

Net income was $2.9 million compared to $73.7 million during the same period in the prior year, and basic and diluted income per share were $0.02 compared to basic and diluted earnings per share of $0.61 during the same period in the prior year.

Adjusted EBITDA decreased 69% to $34.5 million compared to $110.7 million for the prior year period. Adjusted net income decreased 71% to $23.7 million compared to $82.3 million during the same period in the prior year. And adjusted basic and diluted adjusted net income per share was $0.19 compared to $0.69 during the same period in the prior year.

\* \* \*

Turning to our outlook. As Jim mentioned earlier, given the continuing increases we are seeing in steel and freight costs, as well as our ongoing review of open contracts to assess what costs we will pass on to our customers, we are not able to affirm our previously provided guidance for the full year. Looking ahead to the second quarter, we expect commodity price increases to delay some project starts, which will result in lower revenues and adjusted EBITDA versus the first quarter.

61.     Asked by an analyst for the "decision-making process for not hedging steel," Defendant Patel responded that "in the past, that has not been our strategy. We had been . . . let[ting our suppliers] take that risk on."

62.     In reaction to these disclosures, analysts cut their ratings on the Company's stock citing concern about its shrinking profit margins.  For example, Barclays downgraded Array stock from "Overweight" to "Underweight" noting concerns about volumes, margins, and earnings power.  Piper Sandler downgraded its rating to "Neutral" from "Overweight" and similarly cited concerns regarding lack of visibility on revenues and margins.

63.     On this news, the Company's stock dropped $11.49 per share on May 12, 2021 to close at $13.46 per share on unusually high trading volume.  By the commencement of this Action, Array common stock was trading at a significant decline from its value at the time of the Offerings.

## ADDITIONAL SCIENTER ALLEGATIONS RELEVANT TO EXCHANGE ACT CLAIMS

64.     During the Class Period, as alleged herein, the Exchange Act Individual Defendants acted with scienter in that the Exchange Act Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company

during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

65.     The Exchange Act Individual Defendants permitted Array to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

66.     As set forth herein, the Exchange Act Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Array, their control over, receipt, or modification of Array's allegedly materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning Array, participated in the fraudulent scheme alleged herein.

67.     The Exchange Act Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Array securities by disseminating materially false and misleading statements or concealing material adverse facts. The scheme deceived the investing public regarding Array's business, operations, and management and the intrinsic value of Array securities and caused Plaintiff and members of the Class to purchase Array securities at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

68.     During the Class Period, as detailed herein, Defendants made false and misleading statements and the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Array securities, and operated as a fraud or deceit on Class Period purchasers of Array securities by misrepresenting the Company's business

and prospects.   Later, when Defendants' prior misrepresentations and the Exchange Act Defendants' fraudulent conduct became known to the market, the price of Array securities declined as the prior artificial inflation came out of the price over time.   As a result of their purchases of Array securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

69.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Array who knew that the statement was false when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

70.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of:

(a)     All persons or entities who purchased or otherwise acquired Array securities during the Class Period, against the Exchange Act Defendants for violations of the Exchange Act and SEC Rule 10b-5 promulgated thereunder; and

(b)     All persons and entities that purchased or otherwise acquired Array common stock pursuant, or traceable, or both, to: (i) the IPO Materials issued in connection with the IPO; or (ii) the December 2020 SPO Materials issued in connection with the December 2020 SPO; or (iii) the March 2021 SPO Materials issued in connection with March 2021 SPO; or (iv) any combination of the Offerings, against the Securities Act Defendants for violations of Sections 11 and 15 of the Securities Act.

71.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 5, 2021, there were 126,994,467 shares of Array's common stock outstanding.

72.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether Defendants violated the Securities Act or Exchange Act, or both;

(b)     whether Defendants omitted or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      (d)     whether, with respect to the Exchange Act claims only, Defendants knew or recklessly disregarded that their statements were false and misleading;

      (e)     whether the price of Array securities was artificially inflated; and

      (f)     the extent of damage sustained by Class members and the appropriate measure of damages.

73.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

74.     Plaintiff will adequately protect the Class's interests.  Plaintiff has retained counsel experienced in securities class action litigation and Plaintiff's interests do not conflict with the Class's interests.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

76.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

      (a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

      (b)     the omissions and misrepresentations were material;

      (c)     the Company's stock traded in an efficient market;

      (d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

      (e)     Plaintiff and other members of the Class purchased Array securities between the time Defendants misrepresented or failed to disclose material

facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

77.     At all relevant times, the markets for Array securities were efficient for the following reasons, among others:

     (a)    as a regulated issuer, Array filed periodic public reports with the SEC;

     (b)    Array regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

     (c)    Array was followed by several securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

     (d)    Array securities were actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "ARRY."

78.     As a result of the foregoing, the market for Array securities promptly digested current information regarding Array from publicly available sources and reflected such information in Array's stock price.  Under these circumstances, all purchasers of Array securities during the Class Period suffered similar injury through their purchase of Array securities at artificially inflated prices and the presumption of reliance applies.

79.     Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## COUNT I

**(Violations of Section 11 of the Securities Act Against the Securities Act Defendants)**

80.     This Count is brought pursuant to Section 11 of the Securities Act and is based solely on strict liability and negligence, and is not based on any knowing or reckless conduct by or on behalf of any defendant—*i.e*., it does not allege, and does not sound in, fraud—and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud claim.

81.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

82.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Securities Act Defendants.

83.     The Array Offering Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

84.     Array is the registrant and issuer of the common stock sold pursuant to the Array Offering Materials.  As such, Array is strictly liable for the materially inaccurate statements contained in them and their failure to be complete and accurate.  By virtue of the Array Offering Materials containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Array is liable under Section 11 of the Securities Act to Plaintiff and the Class.

85.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Array Offering Materials were true and without omissions of any material facts and were not misleading.

86.     The Securities Act Individual Defendants each signed the Array Offering Materials' registration statements for the Offerings and caused their issuance.  The Securities Act Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Array Offering Materials.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.  By virtue of each of the Securities Act Individual Defendants' failure to exercise reasonable care, the Array Offering Materials contained material misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.  As such, each of the Securities Act Individual Defendants is liable under Section 11 of the Securities Act to Plaintiff and the Class.

87.     None of the untrue statements or omissions of material fact in the Array Offering Materials alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Array Offering Materials did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

88.     Each of the Securities Act Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the registration statements for the Offerings, which misrepresented and failed to disclose, *inter alia*, the facts set forth above.  By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

89.     Plaintiff and the Class have sustained damages.  The value of Array common stock has declined substantially subsequent to and due to violations by the Securities Act Defendants named in this Count.

90.     At the time of their purchases of Array common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein.  Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Plaintiff filed this action.  Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff filed this action.

## COUNT II

**(Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel)**

91.     As previously stated, the claim set forth herein pursuant to Section 15 of the Securities Act is based solely on strict liability and negligence, and is not based on any knowing or reckless conduct by or on behalf of any defendant—*i.e.*, it does not allege, and does not sound in, fraud—and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud claim.  This claim does not sound in fraud.

92.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

93.     This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Securities Act Individual Defendants, ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel.

94.     The Securities Act Individual Defendants each were controlling persons of Array by virtue of their positions as directors or senior officers of Array, ATI, Oaktree ATI, Oaktree Power, or Oaktree Power Parallel.  Certain of the Securities Act Individual Defendants, as outlined in ¶¶ 12-13 and 16-22, signed the Array Offering Materials issued in connection with the Offerings and were responsible for their contents.

95.     ATI was the majority owner and controlled the Company leading up to the IPO.  In addition to controlling a majority of Array's voting shares at that time, ATI, Oaktree ATI, Oaktree Power, or Oaktree Power Parallel also appointed or had significant influence over the Company's management and Board.  They also were parties to various shareholder agreements with each other and the Company that gave them even further control of the Company above and beyond the amount of their voting control, as defined herein.  The Securities Act Individual Defendants had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of Array, including ATI, Oaktree ATI, Oaktree Power, and Oaktree Power Parallel.

96.     ATI, Oaktree ATI, Oaktree Power, Oaktree Power Parallel, and the Securities Act Individual Defendants each were culpable participants in the violations of Sections 11 of the Securities Act alleged in the Count above, and exercised control over Array based on their having signed or authorized the signing of the Array Offering Materials, selling Array shares in the Offerings or having otherwise participated in the process that allowed the Offerings to be successfully completed.

97.     By reason of the conduct alleged herein, these Defendants violated Section 15 of the Securities Act and Plaintiff and the members of the Class have suffered harm as a result.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

98.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99.     During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

100.     The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Array securities during the Class Period.

101.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Array securities.  Plaintiff and the Class would not have purchased Array securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

102.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Array securities during the Class Period.

## COUNT IV

### (Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)

103.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    The Exchange Act Individual Defendants acted as controlling persons of Array within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Array, the Exchange Act Individual Defendants had the power and ability to control the actions of Array and its employees.  By reason of such conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.    Awarding Plaintiff and the members of the Class damages and interest;

C.    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  June 30, 2021                                    Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

Thursday, May 20, 2021

# Array Technologies, Inc.  (ARRY)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Array Technologies, Inc. ("Array" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Array securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or the Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired: (a) Array securities during the Class Period as specified in the Complaint; and (b) Array common stock pursuant, or traceable, or both, to the Array Offering Materials issued in connection with the Offerings as specified in the Complaint; including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  The attached sheet lists all of my transactions in: (a) Array securities during the Class Period as specified in the Complaint; and (b) Array common stock pursuant, or traceable, or both, to the Array Offering Materials issued in connection with the Offerings as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Name**


**Print Name**

Julian Keippel

**Signature**

1



redacted

**Array Technologies, Inc. (ARRY)**                                     **Keippel, Julian**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 5/10/2021 | 25 | $25.0900 |
| Purchase | 5/11/2021 | 10.00 | $25.3900 |
| Purchase | 5/11/2021 | 5.00 | $25.4000 |
| Purchase | 5/11/2021 | 1.00 | $25.3300 |